UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: 19-cr-03255-BTM |
|---|---|
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS STATEMENTS** |
| v. | |
| JOSE FLORES (10), | |
| Defendant. | **[ECF NO. 283]** |

Before the Court is Defendant Jose Flores' motion to suppress statements. (ECF No. 283.)  The Court held an evidentiary hearing and heard oral argument on November 17, 2020.  For the reasons discussed below, the Defendant's motion is granted in part and denied in part.

## I. BACKGROUND[1]

On May 22, 2018, the FBI executed a search warrant on the premises of 205 Lopez Court, Calexico, CA, pursuant to a multi-agency investigation of

---

[1] The following summary of facts is derived from the evidence presented at the November 17, 2020 hearing.

members of the Imperial Valley Ministries.  The premises included a house, which was the then-residence of Defendant (the "Residence").

The search of the Residence occurred at approximately 6:00 a.m., and involved twelve law enforcement officers from the FBI, Homeland Security Investigations ("HSI"), U.S. Customs and Border Protection ("CBP"), and the local sheriff's department.  Two marked sheriff vehicles were parked in front of the Residence.  When the uniformed officers approached the Residence, they were wearing body armor, and were armed, with their weapons unholstered.  One of the officers carried an approximately three-foot-long metal battering ram in preparation to breach the front door, if necessary.  The officers ordered all occupants to exit the Residence, patted them down for approximately twenty to thirty seconds, and then asked them to wait in the Residence's shaded carport area.  Approximately four to five officers then entered the Residence to clear the premises for safety.

As soon as the Residence was cleared and determined to be safe, several officers diverted from the ongoing search and began interviewing the individuals waiting in the carport area.  After finishing an interview with another occupant, FBI Task Force Agent James Escalante approached Defendant in the carport area, wearing a bulletproof vest and carrying a holstered weapon.  Agent Escalante asked Defendant if he was willing to speak with him and answer questions, to which he agreed.  Agent Escalante did not tell Defendant that he was not under arrest, did not tell him that he was free to leave, and did not tell him that he did not have to talk to him.

At Agent Escalante's direction, Defendant was interviewed in the Residence's fenced side yard, near the back of the house.  The width of the side yard was approximately fifteen feet.  Two or three other individuals were being interviewed in the yard at the same time, spaced approximately fifteen feet apart.  The other interviewees in the yard, as well as the individuals waiting in the

carport area, were visible to Defendant during his interview.

Defendant was not read his Miranda rights prior to his questioning. According to Agent Escalante's observations of Defendant, during the course of the approximately fifteen-minute-long interview, Defendant did not appear to be confused, did not appear to be under the influence of alcohol, drugs, or other medication, did not appear to have any significant intellectual deficiencies or cognitive impairments, and did not appear to be ill. In addition, the interview was conducted in English, which Defendant appeared to be fluent.

During the interview, Agent Escalante asked pre-printed questions provided by the case agent, did not confront Defendant with evidence of guilt, and did not promise leniency if Defendant answered questions. Further, Agent Escalante did not gesture to or intentionally display his firearm, did not raise his voice, and did not threaten or coerce Defendant. At some point after the start of Defendant's interview, another officer or agent joined Agent Escalante to assist with the questioning.

At the end of the interview, Defendant returned to the carport area. The individuals waiting in the carport area were able to, and did, talk to each other. An armed officer stood guard in the vicinity during the search to prevent anyone from unexpectedly entering the Residence. At some point after Defendant was interviewed, a mother and her children were permitted to collect belongings from the Residence and left to go to school.

### III. DISCUSSION

Defendant moves to suppress any and all statements he made during his interview with Agent Escalante on May 22, 2018, arguing that his statements were made without the advisal of rights mandated by *Miranda v. Arizona*, 384 U.S. 436 (1966) and were involuntary. The Government opposes suppression, arguing that Defendant's statements were voluntary and that *Miranda*'s warnings were not required because Defendant's statements were not the product of

custodial interrogation.

Under *Miranda*, advisal and waiver of certain Fifth Amendment rights must precede custodial interrogation.  Defendant was at his home at the time of his questioning.  When a "suspect has not formally been taken into police custody, a suspect is nevertheless considered 'in custody' for purposes of *Miranda* if the suspect has been 'deprived of his freedom of action in any significant way.'" *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008) (citing *Miranda*, 384 U.S. at 444).  "To determine whether the suspect was in custody," courts "first examine the totality of the circumstances surrounding the interrogation." *Id.* Courts "then ask whether a reasonable person in those circumstances would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.*

"The element of compulsion that concerned the Court in *Miranda* is less likely to be present where the suspect is in familiar surroundings.  Nevertheless, an interrogation in the suspect's home may be found to be custodial under certain circumstances." *Id.* at 1083.  In determining whether an in-home interrogation is custodial, the Ninth Circuit "considers the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a 'police-dominated atmosphere.'" *Id.*  This determination "is necessarily fact intensive." *Id.* at 1084.  The Ninth Circuit has identified several relevant factors for courts to consider: (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made. *Id.*

First, the large number of armed law enforcement officers that entered Defendant's home, from multiple federal and local agencies, weighs in favor of a finding that Defendant's home was turned into a police-dominated atmosphere.

As the Ninth Circuit in *Craighead* noted:

> When a large number of law enforcement personnel enter a suspect's home, they may fill the home such that there are no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation. Similarly, when the number of law enforcement personnel far outnumber the suspect, the suspect may reasonably believe that, should he attempt to leave, he will be stopped by one of the many officers he will encounter on the way out. The suspect may also believe that the large number of officers was brought for the purpose of preventing his departure. In addition, if the suspect sees the officers unholstering their weapons within his home, the suspect may reasonably believe that his home is no longer safe from the threat of police force. In short, the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere.

*Id.* at 1084–85.

Here, twelve law enforcement officers from four different identifiable agencies entered Defendant's home in the early morning. Most of the law enforcement officers were armed, and they conducted their initial safety search of the premises wearing body armor, and with their weapons unholstered. One officer carried a three-foot-long battering ram in case the front door needed to be breached. Two marked sheriff vehicles were parked outside the house, while all occupants were ordered to exit the house and asked to wait in the carport area for the duration of the search. An armed officer stood guard to prevent any unexpected entries into the house. The large number of armed law enforcement officers, and their order for all occupants to exit and remain outside of the house, necessarily meant that Defendant's home had no police-free rooms or spaces to which Defendant could retreat if he wished to end his questioning. In addition, as the Ninth Circuit noted, the participation of multiple identifiable law enforcement agencies would likely have caused confusion about each agency's coordination and authority to let Defendant go free. *See id.* at 1085 (the presence of three different law enforcement agencies created confusion in defendant as to whether

the remaining agencies might prevent him from leaving, even if one agency told him he was free to go).  A reasonable person in Defendant's position would feel that his home was dominated by a police presence.  *See United States v. Clymer*, 524 F. App'x 354, 355 (9th Cir. 2013) (finding an in-home interrogation to be custodial where "eleven federal and local law enforcement officers, representing six different agencies, executed a search warrant at [defendant's] residence [and] [u]pon entering the residence, the officers drew their weapons"); *United States v. McKany*, 649 F. App'x 553, 554-55 (9th Cir. 2016) (finding a police-dominated atmosphere where "[o]fficers swarmed into [defendant's] home at 6:30 a.m. in full tactical gear and with guns drawn" and "eight to ten officers initially entered the house, and fourteen officers were ultimately involved in executing the search warrant"); *United States v. Holley*, 526 F. App'x 743, 745 (9th Cir. 2013) (finding no police-dominated atmosphere where "only two detectives were present for the interrogation in [defendant's] home"); *United States v. Remy*, 393 F. App'x 427, 429 (9th Cir. 2010) (finding that defendant was not in custody at home during questioning where only two agents were present, and they did not show their weapons); *United States v. Acosta-Licerio*, 756 F. App'x 743, 744 (9th Cir. 2019) (finding that an in-home interview was not a custodial interrogation where defendant "was interviewed in his home and the surrounding area by only two law enforcement agents with no visible weapons"); *United States v. Tobie*, 411 F. App'x 995, 996 (9th Cir. 2011) (finding no police-dominated atmosphere where "[o]nly the two agents were present, and neither showed [defendant] their gun"); *United States v. Wolf*, 472 F. App'x 548, 550 (9th Cir. 2012) (finding no custodial interrogation where "three law enforcement officers entered [defendant's] home dressed in plain clothes" and "[n]one of the officers openly carried weapons").

//

//

Second, while Defendant was frisked for twenty to thirty seconds after exiting his house, the record does not indicate that Defendant was restrained at any point, either by physical force or by threats. Therefore, this factor weighs against a finding of a police-dominated atmosphere.

Third, Defendant was not significantly isolated from others during his questioning in the side yard, which weighs against a finding of a police-dominated atmosphere. "A frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements." *Craighead*, 539 F.3d at 1087. "[T]he Supreme Court [has been] explicit that the law enforcement technique of isolating the suspect from family and friends is one of the distinguishing features of a custodial interrogation." *Id.* Here, Defendant was questioned in his house's approximately fifteen-foot-wide fenced side yard, in the presence of two to three other occupants, who were also being interviewed. This did not create the same level of physical isolation as the storage room interrogation in *Craighead*. Further, while Defendant was separated from the individuals waiting in the carport area during his interview, there was no evidence that any of those individuals were members of Defendant's family or had a close relationship with Defendant. A reasonable person in Defendant's position would not have felt cut off from their moral support.

Fourth, Defendant was not informed that he was not under arrest, was not informed that he was free to leave, and was not informed that he did not have to talk to the questioning officer. This weighs in favor of a finding of a police-dominated atmosphere. Here, (1) twelve law enforcement officers entered Defendant's home, (2) early in the morning at a time a person reasonably would not be prepared to leave their home, (3) most of the officers were armed, and entered Defendant's home wearing body armor and carrying unholstered

weapons, (4) the officers represented four different and identifiable law enforcement agencies, (5) the officers ordered Defendant, along with all other occupants of the house, to exit the house and wait in a carport area, after they were patted down, and (6) an armed officer stood guard to prevent unexpected entries into the house during the search. These factors severely limit where Defendant reasonably could have gone. The lack of any potentially clarifying statements by officers to Defendant that he was not under arrest and free to leave or terminate the interview, further exacerbated these factors. *See United States v. Blanford*, 467 F. App'x 624, 625 (9th Cir. 2012) (finding a police-dominated atmosphere, in part, where "the agents never informed [defendant] that he was free to leave or terminate the interview").

Considering the totality of the circumstances under *Craighead*'s four factors, the Court finds that Defendant's home had become a police-dominated atmosphere. Although Defendant was not restrained by physical force or threats or significantly isolated from others, a reasonable person in his same position would not believe there was anywhere else to go before 7:00 a.m. in the morning, with twelve law enforcement officers from four different agencies searching his home, most of them armed, wearing body armor, and carrying unholstered weapons at the beginning of the search, with an armed officer standing guard to prevent unexpected entries into Defendant's house, after Defendant and all other occupants were ordered to exit the house, and with no potentially clarifying statements given to Defendant that he was free to go and terminate the questioning. The interrogation of Defendant was custodial, and *Miranda* warnings were required.

While the Court concludes that on May 22, 2018, Defendant was subjected to custodial interrogation without being provided the advisal of rights required by *Miranda*, the Court finds that Defendant's statements were voluntary in nature. FBI Task Force Agent Escalante identified himself to Defendant as a federal law

enforcement officer and asked Defendant if he would be willing to speak to him and answer questions, to which he agreed.  During the course of the interview, Agent Escalante did not confront Defendant with evidence of guilt, did not promise leniency if Defendant answered questions, did not threaten or coerce Defendant, did not gesture to or unholster his firearm, and did not raise his voice. Further, according to Agent Escalante's observation of Defendant during the interview, Defendant did not appear to be confused, did not appear to be under the influence of alcohol, drugs, or other medication, did not appear ill, did not appear to have any significant intellectual deficiencies or cognitive impairments, and appeared to be fluent in English.

      Having found that Defendant's May 22, 2018 statements were voluntary despite the *Miranda* violation, the Court holds that the statements cannot be used at trial in the Government's case-in-chief, but can be used for impeachment.  *See Harris v. New York*, 401 U.S. 222, 224 (1971) ("It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards."); *United States v. Patane*, 542 U.S. 630, 639 (2004) ("statements taken without *Miranda* warnings (though not actually compelled) can be used to impeach a defendant's testimony at trial"); *Oregon v. Elstad*, 470 U.S. 298, 307 (1985) ("Despite the fact that patently voluntary statements taken in violation of *Miranda* must be excluded from the prosecution's case, the presumption of coercion does not bar their use for impeachment purposes on cross-examination.").

//
//
//
//
//

## III. CONCLUSION

Based upon the foregoing, the Defendant's motion to suppress his May 22, 2018 statements is **GRANTED IN PART** and **DENIED IN PART**.  Because Defendant's May 22, 2018 statements were made during custodial interrogation but without the warnings mandated by *Miranda*, they may not be introduced at trial during the Government's case-in-chief.  Because such statements were otherwise voluntary, however, they may be used by the Government where appropriate to impeach the Defendant.

IT IS SO ORDERED.

Dated:  November 25, 2020

_____
Honorable Barry Ted Moskowitz
United States District Judge